OPINION
Bonnie J. Hahn appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, which awarded permanent custody of her son, Austin M. Hahn, to the Clark County Department of Human Services ("CCDHS") and terminated her parental rights and duties.
The evidence presented by CCDHS established the following. Austin was born on November 5, 1996. Hahn had had three children prior to Austin's birth, but she did not have custody of any of those children. The identity of Austin's father is unknown.
When Austin was two months old, pediatrician Olsen Rogers, Jr. diagnosed him as having a severe case of asthma. Dr. Rogers testified that, due to the severity of Austin's asthma, he would "certainly [be] at risk for death" if the asthma was not properly controlled. Dr. Rogers prescribed breathing treatments for Austin, to be given every four hours. Eventually, Austin's breathing treatments were lessened to four times per day. Dr. Rogers testified that when he diagnosed Austin with asthma, he told Hahn that she should eliminate any cigarette smoking in her home because Austin needed to be in a smoke-free environment. He stated that cigarette smoke was continually smelled, however, on both Hahn and Austin during later office visits.
In July 1997, Hahn traveled to Florida to visit her father. On November 30, 1997, Hahn began a two-day bus trip back to Ohio. While on the bus, Hahn did not administer Austin's breathing treatments.
CCDHS had prior contact with Hahn regarding her first three children. On December 1, 1997, CCDHS became actively involved with her regarding Austin after receiving a complaint that "Hahn and her son had [recently] returned to Springfield * * * and that [there] was a concern because Austin had asthma and * * * [Hahn] had a history of not taking care of his asthma and making sure his medical needs were being met." Henrietta Curry, a CCDHS family stability worker, visited Hahn on December 8, 1997 to investigate the complaint. During the visit, Curry questioned Hahn about Austin's breathing treatments. Hahn informed Curry that she had not been giving Austin his treatments because she did not have any medicine to put into the machine. Hahn explained the lack of medicine by stating that she had not had any money to purchase it. Hahn told Curry, however, that she was in the process of getting the prescription transferred from Florida to Ohio so that she could obtain the medicine soon.
On December 10, 1997, Curry returned to Hahn's home for another visit. During this visit, Curry noticed that Austin was listless, sleepy, and wheezing. Hahn responded to Austin by putting him on the sofa with a bottle and blanket. Hahn informed Curry that she had made a doctor's appointment for Austin for December 13, 1997. Curry advised Hahn not to wait for the appointment but instead to take Austin to the emergency room immediately. Later that day, Hahn took Austin to the hospital. He was admitted and diagnosed as having a collapsed lung. Dr. Rogers testified that, in his expert opinion, he believed that Hahn had failed to administer Austin's breathing treatments, causing Austin's lungs to become inflamed to the point where one of them eventually collapsed. While Austin was hospitalized, CCDHS took steps to obtain temporary custody of him. When he was released from the hospital on December 15, 1997, he was placed in foster care.
To work toward the reunification of Hahn and Austin, CCDHS initiated a case plan which listed five objectives for Hahn to achieve, including: find suitable stable housing, visit Austin regularly, get a drug and alcohol assessment at McKinley Hall, obtain a mental health assessment, and complete a parenting assessment. The case plan further required the completion of any recommended follow-up treatments after the various assessments. Kimberly Dysert, a CCDHS social worker, reviewed the case plan with Hahn and both signed it.
Hahn's testimony varied slightly from the state's version of the events. She stated that she had given Austin some breathing treatments between the time she had returned from Florida and the time that Austin had been admitted into the hospital, but that she had not given as many treatments as had been prescribed. She testified that although she had an illegal drug habit, she did not believe that she needed anyone to "push" her to quit that habit because she had "[f]aith in God." She stated that she had missed some of the visitations with Austin because she had miscarried a child. She also said that she had been prohibited from attending visitations with Austin while she had head lice. She testified that while she was in Florida, she had taken Austin to the doctor as needed and that he had been properly immunized.
On September 10, 1998, CCDHS filed a motion for permanent custody of Austin, alleging that Hahn had failed to comply with her case plan and continued to be unable to provide a safe environment for Austin. A permanent custody hearing took place on January 14, 1999. On January 28, 1999, the trial court granted permanent custody of Austin to CCDHS and terminated Hahn's parental rights and duties.
Hahn advances two assignments of error on appeal.
 I. AGENCY'S LACK OF DILIGENT EFFORTS TO ASSIST APPELLANT IN REMEDYING PROBLEMS THAT INITIALLY CAUSED CHILD TO BE PLACED OUTSIDE THE HOME WAS CONTRARY TO LAW, 2151.414
AND NULLIFIED ANY CLAIM OF REASONABLENESS IN CASE PLANNING THAT LED TO AWARD OF PERMANENT CUSTODY TO SAID AGENCY.
Hahn argues that CCDHS failed to adhere to the requirements of R.C. 2151.414(E)(1) because its case planning exhibited "a pervasive lack of diligent efforts" which "tainted the stated goals of the Case Plan and operated to defeat the reasonableness" of CCDHS's case planning.
Before beginning our discussion, we note two things. First, we have sua sponte caused the three exhibits that were admitted during the trial to be made part of the appellate record, and we have carefully reviewed these documents. Second, CCDHS's motion for permanent custody was filed on September 10, 1998. Thus, although R.C. 2151.414 was amended as of March 18, 1999, the former version of that statute, which became effective on September 18, 1996, applies in this case.
"The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." Miller v. Miller (1988),37 Ohio St.3d 71, 74, 523 N.E.2d 846, 849. "While the trial court's discretion in a custody proceeding is broad, [however,] it is not absolute, and must be guided by the language of the relevant statute." In re Beal (Oct. 5, 1992) Clark App. No. 2903, unreported, at *3.
Pursuant to R.C. 2151.414(B), the trial court was permitted to grant permanent custody of a child who had not been abandoned or orphaned to a public children services agency that had temporary custody of the child, if the trial court determined, by clear and convincing evidence, that: (1) it was in the child's best interests to do so and (2) that the child could not be placed with either of his parents within a reasonable time or should not be placed with his parents. R.C. 2151.414(E) provides a list of alternative circumstances which would cause the trial court to find that the child could not be placed with his parents within a reasonable time or should not be placed with his parents. R.C.2151.414(E) states, in part:
 If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
"Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven." In re Dylan C. (1997),121 Ohio App.3d 115, 121, 699 N.E.2d 107, 111, citing Cross v. Ledford
(1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus. "An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof." In re Dylan C.,121 Ohio App. 3d at 121, 699 N.E.2d at 111, citing In re Adoption ofHolcomb (1985), 18 Ohio St.3d 361, 368, 481 N.E.2d 613, 621.
In its ruling, the trial court determined that CCDHS had "made determined and reasonable efforts to prevent [the permanent] removal of the child from his home [and to] * * * enable the child to return home[.]" Our review of the record supports this finding. CCDHS offered to pay for Hahn to go to a residential drug and alcohol facility for treatment, but Hahn failed to complete the treatment. Dysert made a number of phone calls attempting to locate residential drug and alcohol facilities that had an opening for Hahn, but Hahn failed to place her name on the list to gain admission to one facility and failed to follow-up with the other facilities. Hahn experienced problems finding transportation to the visitations, so Dysert obtained bus passes for Hahn and personally delivered the passes and a bus schedule to her. Even after Hahn had the passes, however, her attendance at the visitations remained "sporadic" and she continued to rely on rides from other people instead of utilizing the passes. Dysert made phone calls to reschedule some of Hahn's missed visitations, but Hahn missed the make-up visits as well. CCDHS offered to pay for Hahn's parenting assessment, but Hahn failed to complete the assessment. Although it took CCDHS a number of months to make a referral so that Hahn could obtain a parenting assessment, Dysert explained that the delay was due to the death of CCDHS's regular parenting assessment provider. The record further reveals that CCDHS provided consistent case management services for Hahn by continually attempting to educate her and direct her toward appropriate resources and assistance. Thus, we cannot conclude that the trial court erred in finding that CCDHS utilized reasonable case planning and diligent efforts to assist Hahn in remedying the conditions which had caused Austin to be placed in foster care.
The first assignment of error is overruled.
 II. THE COURT ABUSED ITS DISCRETION BY REACHING JUDGEMENT PERFUNCTORILY AS TO STATUTORY MANDATES, AND EFFECTIVELY RUBBER STAMPED THE AGENCY POSITION FOCUSING ON APPELLANT'S WEAKNESSES ONLY.
Hahn argues that the trial court "clearly ruled in a mere rubber stamp fashion" because the wording of its opinion in this case is similar to its wording in an earlier parental rights case,In Re Jenkins/Williams Children (May 14, 1999), Clark App. No. 98 CA 16, unreported. Hahn argues that because R.C. 2151.414
requires that the trial court make an individual case by case determination in each parental rights case, the trial court erred when it used "assembly line decision making" in this case.
As we stated supra, the trial court was permitted to grant permanent custody of Austin to CCDHS if it determined, by clear and convincing evidence, that: (1) it was in the child's best interests to do so and (2) that the child could not be placed with either of his parents within a reasonable time or should not be placed with his parents. R.C. 2151.414(B). R.C. 2151.414(D) lists factors for the court to consider to determine whether granting permanent custody of the child to the public children services agency would be in the child's best interests. R.C.2151.414(D) states:
 In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
When asked whether she believed that a bond existed between Hahn and Austin, Dysert testified, "I don't know if I've really seen a parent/child bond. Bonnie is very good around Austin as far as interacting with him, but Austin would go and play with her; but then when it got time to go, he would get ready and go. * * * At the beginning a couple times he did cry, but over the last few months that hasn't happened." She further stated that she had "watched Austin around [his] foster parents at different functions and in their home, and he refers to the foster mom as mom; and Austin really seems to have a bond with the foster father."
At trial, Austin's guardian ad litem, Eric Sommer, testified as follows:
 [Austin's] fragile medical condition necessitates the presence of a parent who is attentive and able to care for his needs, and Miss Hahn's unstable life-style would not enable her to do that.
 She lacks the strong resolve necessary to address the numerous issues that she has in her life. And in lacking that resolve, it is unlikely that she will make the changes necessary to become a proper parent.
 She unambiguously states that she wants to make the changes necessary, but her conduct just as clearly indicates that she lacks the ability to do that.
He concluded his testimony by recommending that CCDHS's motion for permanent custody be granted.
The record reveals that Austin was removed from Hahn's care in December 1997, when he was thirteen months old. At the time of trial, Austin was two years old. Hahn was originally given visitation twice each week, but that visitation was reduced to once a week after she failed to regularly attend the visitations. Her attendance was described as "sporadic" and Dysert estimated that she had only attended forty to fifty percent of the visitations.
Dr. Rogers testified that while Hahn had custody of Austin, she had not been consistent in providing him with the health care that he needed. He stated that Austin had not been properly immunized and that at least twice, she had made appointments but had failed to keep them. He testified that this lack of consistent health care concerned him because "[a]sthma is a chronic illness [that] * * * has to be monitored very carefully." He further stated, "given the severity of [Austin's] asthma, it is even more important that it be monitored carefully to make sure it is under control." He said that the only way to monitor and control Austin's asthma would be to assure that he was taken to well-child checkups regularly and to office visits for illness when needed.
Hahn testified that she works as an exotic entertainer five days a week, twelve hours each day, earning around nine thousand dollars each year. She stated that after working all night, she usually did not wake up until two o'clock in the afternoon and that she had to report to work at six o'clock in the evening. She admitted that she had a history of using illegal drugs. When asked if she was presently using illegal drugs, she replied, "Right now it's too costly. Seasons-the holiday season kills all that. * * * It's too expensive." When asked how much money she estimated that she would be spending on drugs in the springtime, she testified, "I wouldn't say so much a month. Drugs is [sic] something that you don't necessarily keep track of a month. It's how much you want at that time. It's how much your body feels that it craves. It's how much your body thinks that it needs." She stated that her "recent" habit had cost her approximately $150 per month. When asked how long she believed it would take her to be completely independent of drugs, she testified, "It's a forever battle. You could quit for ten years. You could quit for five months. It is always going to be there nagging at you, tugging at your chain. * * * I'm going to try [to] * * * keep it away to the best of my ability."
Based upon the evidence presented at trial, we cannot conclude that the trial court erred in concluding that it would be in Austin's best interests to grant permanent custody of him to CCDHS.
Further, the trial court did not err in concluding that Austin could not be placed with Hahn within a reasonable period of time or should not be placed with her. As we stated supra, the record supports the trial court's finding that CCDHS utilized reasonable case planning and made diligent efforts to reunite Hahn and Austin. The record also supports the trial court's finding that Hahn failed continuously and repeatedly to substantially remedy the conditions which had caused the child to be placed outside her home. The first objective of her case plan was to find suitable and stable housing. Hahn testified that she had lived in six different places during the year Austin had been removed from her care, including her father's residence, the residences of two different friends, and a motel. She further stated that she had been evicted from one residence. The second objective of the case plan was to visit Austin, but she only attended between forty and fifty percent of the scheduled visitations. The third and fourth objectives were to get a drug and alcohol assessment and a mental health assessment. She did get the initial assessments for each, but failed to follow-up with individual counseling as recommended. The fifth objective was to get a parenting assessment, which she failed to complete.
We conclude that clear and convincing evidence supports the trial court's decision to award permanent custody of Austin to CCDHS. We believe that as long as the record supports the trial court's ruling, the trial court's usage of similar language in different opinions is acceptable.
The second assignment of error is overruled.
The judgment of the trial court will be affirmed.
FAIN, J. and KERNS, J., concur.
(Hon. Joseph D. Kerns sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
Roger A. Ward, Ronald R. Boblitt, HON. JOSEPH N. MONNIN